## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Christopher Concannon, depose and make this affidavit in support of a complaint alleging a violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(8), by TYQUINN CANNON, who also uses the alias "Q."

I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). I have been a Special Agent with ATF for approximately 16 years. As an ATF Special Agent, I am authorized to investigate violations of the laws of the United States, and I have been involved with numerous criminal investigations involving violations of federal law. As an ATF Special Agent, I have completed the Criminal Investigator Training Program and ATF Special Agent Basic Training at the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training in the investigation of federal crimes involving firearms, narcotics, arson and explosives. I am currently assigned to the ATF Boston Field Division – Portland Field Office. I have participated in numerous arrest and seizure warrants involving a variety of offenses, including violations pertaining to firearms investigations.

I have personally reviewed reports and documentation, observed scene photographs, and have had conversations with ATF personnel and other local law enforcement agencies in regard to the offense referred to herein. I am familiar with the facts and circumstances of this matter concerning TYQUINN CANNON, who is presently a target of an ATF investigation.

### BACKGROUND OF INVESTIGATION AND PROBABLE CAUSE

1. The ATF is conducting a criminal investigation of TYQUINN M. CANNON and others, known and unknown, who, together, are members of a criminal conspiracy that has, as one of its objects, perpetrated the straw purchasing and trafficking of firearms from federal

1

firearms licensees ("FFLs") in the District of Maine. Relatedly, I am conducting an investigation of TYQUINN M. CANNON's unlawful possession of firearms in the District of Maine.

2. I have obtained and reviewed certified court records of the matter of *Illinois v. Tyquinn M. Cannon*, Criminal Docket No. 2017-CF-114, in the Circuit Court of Bureau County, Thirteenth Judicial Circuit, at Princeton, Illinois. Based on my review of the same, I know that a criminal judgment was entered in that court against TYQUINN M. CANNON on March 12, 2018, following his plea of guilty to the Illinois state felony offenses of Unlawful Possession of a Controlled Substance (Cocaine) (Ch. 720, Sect. 570/402(a)(2)(A)) and Unlawful Possession of a Controlled Substance (Marijuana) (Ch. 720, Sect. 550/5(f)). Under that judgment, TYQUINN M. CANNON was sentenced to concurrent five-year terms of confinement in the Illinois Department of Corrections. I have obtained and reviewed certified Illinois Department of Corrections records verifying that TYQUINN M. CANNON was incarcerated from March 20, 2018 through May 15, 2020.

3. I therefore believe and submit that TYQUINN M. CANNON, no later than May 15, 2020, knew that he had been convicted of a crime punishable by imprisonment for a term exceeding one year, as required by 18 U.S.C. § 922(g)(1) and the United States Supreme Court's decision in *Rehaif v. United States*.

4. As part of the ATF's broader investigation of straw purchasing and trafficking of firearms from FFLs in central and southern Maine, I have obtained and reviewed a Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives Form 4473, Firearms Transaction Record ("Form 4473") provided by an FFL located in Turner, Maine. The Form 4473 recorded the purchase of one or more firearms on August 11, 2022, including one Glock, model 23Gen3, .40 caliber pistol bearing serial number BXDK781. For purposes of this

Affidavit, I refer to this Glock, model 23Gen3, .40 caliber pistol bearing serial number BXDK781 as "the firearm." The firearm was located less than a month later in the possession of TYQUINN M. CANNON, as I describe below.

5.  During the early morning hours of September 8, 2022, Massachusetts State Trooper Michael Green was on patrol on Interstate 290 in Auburn, Massachusetts. I have reviewed the written report compiled by Trooper Green concerning the events in question that occurred on that date, as detailed below. I additionally had a telephonic meeting with Trooper Green on September 15, 2022, during which he confirmed the same details. I reference here Trooper Green's report and first-hand observations.

6.  While patrolling Interstate 290 westbound in Auburn at approximately 2:55 a.m. on September 8, 2022, Trooper Green observed a red 2006 Mazda Tribute with Maine license plate 6009ZB ahead of him in the middle lane. Trooper Green observed the vehicle slowly drift from the middle lane to the left lane, and noticed that the tires of the vehicle crossed over the white skip marks before correcting back into the middle lane. Trooper Green then observed the vehicle immediately take the next exit off Interstate 290 westbound.

7.  Trooper Green turned in the median of Interstate 290 and rerouted his cruiser to travel eastbound. After doing so, he again observed the red 2006 Mazda Tribute with Maine license plate 6009ZB ahead of him. Trooper Green observed the vehicle take a series of off ramps to reverse direction. He observed the tires of the vehicle go over the white skip line once more, and further observed—after the vehicle corrected slightly—that it remained on the far left to the skip line. Trooper Green finally observed the vehicle travel from the very far left of the travel lane across to the next exit ramp. Trooper Green activated his cruiser's emergency blue

lights, signaling to the vehicle to stop, which it did at the end of the off ramp at Southbridge Street in Auburn.

8. As Trooper Green observed it, the stop of the vehicle appeared to be abrupt, as if it was not fully stopped when the operator shifted gears to park. Trooper Green then saw the vehicle begin to rock side to side, as if the occupants inside were moving about. He therefore requested the assistance of an area patrol from the Auburn Police Department. Prior to assistance arriving, Trooper Green exited his cruiser and approached the vehicle on foot on its passenger side to make contact with the occupants.

9. The passenger of the vehicle provided Trooper Green with New York identification. The operator of the vehicle provided Trooper Green with New York identification showing himself to be TYQUINN M. CANNON. As TYQUINN M. CANNON searched to find the registration for the vehicle, Trooper Green observed inside the vehicle a large plastic bag with a green leafy substance inside of it.

10. Through his training and experience, Trooper Green believed the green leafy substance to be marijuana. He therefore asked TYQUINN M. CANNON if TYQUINN M. CANNON had any more marijuana in the vehicle. To this, TYQUINN M. CANNON stated that he did not have anything in the car. Trooper Green advised TYQUINN M. CANNON that Trooper Green could clearly see the large bag appearing to contain marijuana. TYQUINN M. CANNON responded by grabbing the bag and handing it to Trooper Green. Trooper Green observed it to be a large, gallon-sized Ziploc bag labelled, "ORANGE CRUSH ½ Pound." According to Massachusetts state law, adults generally may only hold up to one ounce of marijuana on their person.[1]

---

[1] *See* https://malegislature.gov/laws/generallaws/parti/titlexv/chapter94g/section13 (last visited Oct. 12, 2022).

4

11. Trooper Green informed TYQUINN M. CANNON that Trooper Green was going to search the vehicle. TYQUINN M. CANNON became upset and argumentative, stating that Trooper Green was not going to search the vehicle. While TYQUINN M. CANNON remained in the vehicle, Trooper Green had the passenger step out and be pat frisked for weapons, with negative results. TYQUINN M. CANNON appeared to be very anxious, and tried to open the door to exit the vehicle. Trooper Green told TYQUINN M. CANNON to remain in the vehicle until he (Trooper Green) had walked over to the driver's side of the vehicle. At that point, Trooper Green, assisted by an Auburn Police Department officer, had TYQUINN M. CANNON exit the vehicle and pat frisked him for weapons.

12. Trooper Green observed a satchel over TYQUINN M. CANNON's shoulder. Trooper Green grabbed the satchel, and felt that it was heavy for its size; when squeezed, the satchel felt to Trooper Green to contain a heavy object that appeared to be a gun. TYQUINN M. CANNON began to give some resistance, becoming tense and turning away from the vehicle. However, he then requested to be placed in handcuffs, and was placed into handcuffs without incident. Trooper Green inquired of TYQUINN M. CANNON whether TYQUINN M. CANNON had a license to carry a firearm. TYQUINN M. CANNON said that he did not. Trooper Green then administered *Miranda* to TYQUINN M. CANNON and placed him in the rear of Trooper Green's cruiser. Inside the satchel was the firearm—the Glock, model 23Gen3, .40 caliber pistol bearing serial number BXDK781—along with three plastic "corner baggies" each containing a white powder and three bundles of wax paper baggies containing an off-white powder.

13.     Trooper Green determined that the firearm was loaded with a round chambered. Trooper Green has provided me with photographs of this firearm, one of which I reproduce below:



Through my investigation as discussed above, *see* Paragraph 4, I know that this firearm was purchased on August 11, 2022, at an FFL located in Turner, Maine.

14.     A further search of the vehicle revealed a package of wax baggies and plastic sandwich baggies and two small scales, as well as another half-pound Ziploc bag appearing to contain marijuana and some smaller bags containing the same. TYQUINN M. CANNON also had on his person an undetermined amount of United States currency. Located in his driver's side door was a box containing six rounds of 40mm ammunition.

15.     Trooper Green transported TYQUINN M. CANNON to the Massachusetts State Police barracks in Holden, Massachusetts (the "Holden Barracks") for booking on a series of

6

Massachusetts state criminal charges, including felony firearms and drug offenses. There, TYQUINN M. CANNON was again advised of his rights against self-incrimination. In response to questioning by Trooper Green, TYQUINN M. CANNON admitted purchasing the firearm for $700 in a private sale at a location in Maine. TYQUINN M. CANNON stated that he had driven from Maine to Massachusetts with the firearm.

16. Later in the day on September 8, 2022, TYQUINN M. CANNON requested to speak with narcotics investigators. In response to TYQUINN M. CANNON's request, DEA Task Force Officer ("TFO") Jamie Vitale, a Massachusetts State Trooper assigned to the DEA's Boston Division Office, met with TYQUINN M. CANNON at the Holden Barracks. TFO Vitale and a colleague conducted a consent interview of TYQUINN M. CANNON. I have reviewed the written report compiled by TFO Vitale covering his interview of TYQUINN M. CANNON on that date, as detailed below, and additionally have had several telephonic conversations with TFO Vitale since then, where he confirmed the same details. I reference here TFO Vitale's report and first-hand observations.

17. TYQUINN M. CANNON related to TFO Vitale that he was in the process of moving to Maine and had been en route from Maine to Syracuse, New York, for a court appearance on a pending case when he was stopped by Trooper Green. TYQUINN M. CANNON related that he was in possession of the drugs[2] and firearm because he was afraid that his apartment in Maine would be burglarized while he was traveling out of state.

---

[2] While at the Holden Barracks, Massachusetts State Police personnel determined that the substances seized from TYQUINN M. CANNON comprised approximately 25 grams of suspected cocaine; 5 grams of suspected fentanyl; approximately 25 grams of MDMA; and approximately one pound of suspected marijuana. The substances were field tested by TFO Vitale. The field tests resulted in presumptive positives for cocaine, MDMA and heroin-fentanyl.

7

18.     TYQUINN M. CANNON related to TFO Vitale that he (TYQUINN M. CANNON) had purchased both the drugs and firearm from an individual in the town of Monmouth, Maine, and frequented a female associate's residence located in North Monmouth, Maine.

19.     TYQUINN M. CANNON further related that he could identify or confirm the location of the female associate's residence if he was able to refer to the Google Maps history contained in the application on his cell phone, an Apple iPhone. TFO Vitale retrieved the Apple iPhone vouchered as TYQUINN M. CANNON's property and provided it to TYQUINN M. CANNON. TYQUINN M. CANNON unlocked the device and reviewed the direction history shown on the Google Maps application on the device. The Google Maps application on TYQUINN M. CANNON's Apple iPhone displayed a destination in North Monmouth, Maine. When asked by TFO Vitale if TYQUINN M. CANNON utilized the Apple iPhone for anything other than GPS navigation, TYQUINN M. CANNON responded that the Apple iPhone did not have cell service and could only be utilized by connecting to a Wi-Fi hotspot. TFO Vitale inspected the cell phone, however, and noted that the device appeared to be connected to a cellular network. TYQUINN M. CANNON provided to TFO Vitale (315) 775-9804 as the number for the Apple iPhone. TFO Vitale then used his own cell phone to place a call to (315) 775-9804. Once TFO Vitale did so, he observed TYQUINN M. CANNON's Apple iPhone receive an incoming call displaying TFO Vitale's cell phone number.

20.     On September 22, 2022, I obtained a search and seizure warrant from the U.S. District Court for the District of Massachusetts for TYQUINN M. CANNON's Apple iPhone, which had remained secured as TYQUINN M. CANNON's personal property during his pretrial detention at the Worcester County Jail & House of Corrections. On September 23, 2022, I

travelled to the Worcester County Jail & House of Corrections. There, I met with Sergeant Ryan Bennett, who transferred TYQUINN M. CANNON's Apple iPhone to my custody pursuant to the search warrant. On that same date, I transported TYQUINN M. CANNON's Apple iPhone to the New England Regional Computer Forensics Laboratory ("NERCFL") in Chelsea, Massachusetts, and there transferred the cell phone to ATF Special Agent Mattheu Kelsch for forensic examination.

21. On September 28, 2022, ATF Special Agent Mattheu Kelsch informed me that NERCFL had successfully accessed TYQUINN M. CANNON's Apple iPhone, thereby enabling the device to be searched. I know from my training and experience that the process of searching a smartphone, such as an Apple iPhone, involves creating an exact copy or "mirror image" of the device's operating system, all applications, and various forms of data. This mirror image is generated by forensic equipment and associated software which preserves the data without altering it. The forensic device produces a file which allows investigators to review the smartphone data in its native format and in categories based upon applications. TYQUINN M. CANNON's Apple iPhone was imaged in this manner, using the forensic device to maintain the integrity of the device's internal data while generating a review file for purposes of my search and investigation.

22. I have reviewed a copy of internal geolocation data seized from TYQUINN M. CANNON's Apple iPhone. Using cell tower activity, this data indicates that TYQUINN M. CANNON's Apple iPhone was geolocated in the area of Monmouth, Maine, in Kennebec County prior to midnight on September 7, 2022. In addition, my review of a copy of internal message content data seized from TYQUINN M. CANNON's Apple iPhone indicates he was in Maine immediately prior to his Massachusetts arrest. For example, in Facebook messages sent

to two different recipients on September 6, 2022, in response to being asked over Facebook message "Wya,"[3] TYQUINN M. CANNON responded "Maine."

23. I have additionally obtained and reviewed business records from New Hampshire EZ-Pass showing travel by the same 2006 Mazda Tribute with Maine license plate 6009ZB driven by TYQUINN M. CANNON at the time of his Massachusetts arrest on September 8, 2022. The New Hampshire EZ-Pass records showed that on September 5, 2022 at 4:11 a.m. the vehicle traveled northbound through the Hampton toll plaza in New Hampshire, and that on September 8, 2022 at 1:31 a.m., the vehicle traveled southbound back through the Hampton toll plaza in New Hampshire.

24. Based on my review of the description and photos of the firearm provided by Trooper Green, I am aware that it was not manufactured in Maine. The firearm bears exterior engraving indicating it was "Made in Austria." Based on my training and experience I understand the firearm to have been imported by Glock, Inc., which is located in Smyrna, Georgia. Additionally, on September 21, 2022, Special Agent Justin Blais, an ATF expert in interstate nexus determinations, completed a review of the description and photographs of the firearm, including but not limited to the serial number, name of the manufacturer, and caliber, and likewise concluded that the firearm was not manufactured in Maine. The firearm remains in the custody and control of the Massachusetts state police, pending its transfer into ATF custody.

25. It is therefore my opinion that the firearm was received and/or possessed in the State of Maine after traveling in interstate and foreign commerce. In addition, my initial

---

[3] "Wya," as I understand the phrase, is shorthand for the question "Where you at?"

10

physical examination of the firearm, taken together with my knowledge and expertise, indicate that it is a firearm within the meaning 18 U.S.C. § 921(a)(3).

26. Based on the above, I respectfully request that the Court charge TYQUINN CANNON aka "Q" for violating Title 18, United States Code, Section 922(g)(1), by being a felon in possession of a firearm.

I, Christopher Concannon, hereby swear under oath that the information set forth in this affidavit is true and correct to the best of my knowledge, information, and belief, and that I make this oath under pains and penalties of perjury.

Dated at Portland, Maine, this 14th day of October, 2022.

Christopher Concannon
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Sworn to telephonically and signed electronically in accordance with the requirements of Rule 4.1 of the Federal Rules of Criminal Procedure

Date: Oct 14 2022

City and state: Bangor, ME

John C Nivison U.S. Magistrate Judge
*Printed name and title*

*Judge's signature*

11